**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| ) | |
| MAHMOUD REZA BANKI, ) | |
| ) | |
| *Plaintiff,* ) | |
| v. ) | Case No.: 3:24-00464-TJC-MCR |
| ) | |
| BANK OF AMERICA, N.A., ) | |
| ) | |
| *Defendant.* ) | |
| ) | |

**PLAINTIFF'S AMENDED COMPLAINT**
**PERMANENT INJUNCTIVE RELIEF REQUESTED**
**DECLARATORY RELIEF REQUESTED**
**DEMAND FOR A JURY TRIAL**

**NATURE OF THE CASE**

1.     This is a civil action for damages and other relief arising from Defendant Bank of America's deliberate "debanking" of Plaintiff Mahmoud Reza Banki and its multiple violations of his rights under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* ("ECOA" or "the Act"). Defendant violated Mr. Banki's rights under ECOA in at least two ways. First, the bank unlawfully failed to provide Mr. Banki a written statement explaining the specific reasons for the bank's adverse action on his application for a credit account, in violation of 15 U.S.C. §§ 1691(d)(2)–(3) and 12 C.F.R. § 202.9(a)(2)(i) and § 202.9(b)(2). Second, the bank unlawfully discriminated

against Mr. Banki on the basis of national origin by denying his credit application based on his Iranian national origin, in violation of 15 U.S.C. § 1691(a).

## PARTIES

2. Plaintiff Mahmoud Reza Banki is a citizen of the United States and a resident of the State of Florida. Mr. Banki immigrated to the United States from Iran, the country where he was born, and remains a citizen of Iran. Thus, Mr. Banki possesses dual U.S.-Iranian citizenship.

3. Defendant Bank of America, N.A., is a national banking association with its principal place of business in Charlotte, North Carolina. Defendant may be referred to herein as "BoA" "BANA" or "the bank." Bank of America is the second largest bank in the United States with approximately 15% of all domestic deposits. Bank of America regularly extends credit to applicants.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action under 15 U.S.C. § 1691e(f) and 28 U.S.C. § 1331 as this action arises under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*.

5. Venue is proper in this judicial district under 28 U.S.C. § 1391 because both Plaintiff and Defendant reside in the Middle District of Florida,

and because a substantial part of the events or omissions giving rise to his claims occurred in the Middle District.

**FACTUAL ALLEGATIONS**

6.      Mr. Banki's life story is truly remarkable.  Mr. Banki was born and raised in Iran.  In 1994, at age 18, he came to the United States, as one of the top 15 high school students in all of Iran, to attend college in America.  After deciding to make America his permanent home, Mr. Banki became a naturalized U.S. citizen in 1996.  That same year, his younger brother, Pouya, came to America from Iran to follow in his brother's footsteps, and Mr. Banki looked after Pouya while pursuing his own education.

7.      Speaking little English at first, Mr. Banki attended Purdue University and then the University of California at Berkeley, from which he graduated with a double major.  He went on to earn a Ph.D. in chemical engineering from Princeton University.  Mr. Banki wrote his doctoral thesis on his discovery of an important breakthrough in recombinant DNA and protein purification technology.  A Princeton professor, Dr. Saeed Tavazoie, once wrote that Mr. Banki was one of "the most promising young scientists I have ever known in my two-decades life in academia."  Mr. Banki has authored a book on biotechnology, filed two patent applications, and published peer-reviewed articles in leading scientific journals.  Later in life, Mr. Banki obtained an MBA degree from UCLA's Anderson School of Management.

8.     In March 2023, some 30 years after coming to the United States, Mr. Banki's career had advanced to the point that he was serving as the Chief Financial Officer and Chief Strategy Officer of Tubi, Inc., a media company that Fox Corporation had acquired a few years earlier for nearly half a billion dollars.

9.     As CFO and CSO of Tubi, Mr. Banki had a steady, six-figure income stream and an exceptional credit score. But that was not good enough for Bank of America, which deemed him unworthy of having a simple credit card.

10.     On March 18, 2023, Mr. Banki submitted an online application for a Bank of America credit card. *See* Exhibit A.

11.     To complete the application, Mr. Banki told BoA that he is a United States citizen; that the United States is his country of residence; that his occupation is "CEO/Executive/VP"; that his total annual income is $400,000; and that his monthly housing payment is $2,200.

12.     The BoA application form also asked if he has dual citizenship, to which he answered "Yes." For country of dual citizenship, Mr. Banki entered "Iran (the Islamic Republic of)."

13.     Bank of America denied Mr. Banki's credit card application. *See* Exhibit B.

14. Thereafter, he received from BoA a letter dated March 18, 2023, which stated that "Your application for the Bank of America Unlimited Cash Rewards Visa Signature card was received. After our review, we've determined that we're unable to approve your request because your risk profile does not align with the bank's risk tolerance." *See* Exhibit C.

15. Bank of America failed to explain to Mr. Banki why BoA decided to deny his credit card application. Its letter did not indicate the specific reason or reasons for the bank's decision. The letter did not explain what Bank of America meant by Mr. Banki's "risk profile" or why his "risk profile" supposedly did not align with BoA's "risk tolerance." The bank did not even explain what kind of "risk" it was talking about.

16. Mr. Banki was confused and confounded by Bank of America's decision and its letter. When Mr. Banki applied for the credit card, BoA knew that he was a U.S. citizen; it knew that he resided in the United States; it knew that he was employed as a corporate executive; it knew that he had an annual income of $400,000; and it knew that he had a very affordable monthly housing payment of $2,200. Bank of America knew these facts because its online application asked him to disclose them, and he completed that application. The bank also knew Mr. Banki had an exceptional credit score. None of this information would have caused the bank to deny his application. But Bank of America also knew that Mr. Banki is a citizen of Iran—again, because its

application had solicited that information. Based on these facts, as well as other facts known about Bank of America's debanking practices and discrimination against persons from Iran, it may and should be inferred that the bank denied Mr. Banki's credit application based on forbidden grounds—his Iranian national origin.

17. On April 8, 2023, a few weeks after the bank denied his credit card application, Mr. Banki visited the Bank of America branch in Jacksonville, Florida, located at 9225 Baymeadows Road, where he was assisted by Carolina Espaillat, Relationship Manager Business Owner Specialist. Mr. Banki went to the bank to open a checking and savings account, and he completed an application. Ms. Espaillat advised Mr. Banki that his application was denied, but she would not or could not explain why.

18. Ms. Espaillat gave him a form that stated: "We appreciate your interest in our products. Based on our records, we're unable to open new deposit products or services for one or more applicants. For questions, you can call the Account Closure Team at 1.885.241.4049." Exhibit D.

19. Mr. Banki called the Account Closure Team to obtain information about the "records" that made Bank of America unable to open the accounts, but the Account Closure Team refused to give him any information about the bank's refusal to open an account for him. The Account Closure Team told Mr. Banki that BoA did not have to give him a reason for its decision.

20. After Bank of America denied his credit card application, Mr. Banki sent letters to the bank. He sent one letter on August 4, 2023, and a second letter on November 15, 2023. *See* Exhibits E & F. In his letters, Mr. Banki asked Bank of America to explain why it had denied his application. Although Bank of America received and reviewed his letters, it never provided an explanation for its credit decision.

21. In both letters, Mr. Banki asked Bank of America to provide the following information: (1) A detailed explanation of why the bank denied Mr. Banki's applications for a credit card and checking and savings accounts; (2) a detailed explanation of the basis or bases for the bank's statement that Mr. Banki's "risk profile does not align with the bank's risk tolerance"; (3) a copy of the "records" based on which the bank declined Mr. Banki's request to open checking and savings accounts; (4) a copy of all documents and information the Bank considered or used during its risk assessment of Mr. Banki; and (5) a copy of all Bank of America policies that provided a basis for denying Mr. Banki's applications. Bank of America never provided the requested information.

22. Bank of America simply ignored Mr. Banki's first letter. His second letter generated a reaction.

23. In November 2023, a law firm representing Bank of America contacted counsel for Mr. Banki to discuss his inquiries. After communicating

7

with Mr. Banki's counsel in November and December 2023, the law firm abruptly broke off all contact without ever providing any insight into why the bank denied his credit application.

24. Bank of America's denial of Mr. Banki's credit card application—and its subsequent refusal to provide any meaningful explanation for its decision—confirm that the bank has acted in bad faith toward Mr. Banki.

25. Plaintiff's allegations that Bank of America has discriminated against him on the basis of his Iranian national origin, *see supra,* ¶¶ 9–18, is entirely plausible. Indeed, this is not the first time that Bank of America has been accused of debanking and discriminating against Iranian citizens residing in the United States.

26. In *Nia v. Bank of America, N.A.*, 603 F. Supp. 3d 894 (S.D. Cal. 2022), the plaintiff, Mohammad Farshad Abdollah Nia, was an Iranian citizen and permanent resident of the United States. Mr. Nia alleged in his complaint that Bank of America closed his credit account in violation of ECOA's prohibition against national origin discrimination. The bank moved to dismiss, arguing that Mr. Nia had failed to state an ECOA discrimination claim.

27. The district court rejected Bank of America's arguments and denied its motion to dismiss. The court held that Mr. Nia had "pled facts that plausibly suggest BANA acted on the basis of Plaintiff's protected status, since he alleges he was denied credit despite being qualified and also alleges

8

widespread unfair treatment of Middle Eastern individuals by BANA." *Nia*, 603 F. Supp. 3d at 903. Mr. Nia had alleged "that BANA has a practice of discriminating against Iranian and Middle Eastern individuals as evidence by multiple consumer complaints, news sources, and social media posts." *Id*. at 902. He also alleged "that BANA placed confusing and inconsistent obstacles in the way of Iranian and Middle Eastern individuals seeking credit." *Id*.

28. The Class Action Complaint filed by Mr. Nia in August 2021 reproduced numerous complaints reported to the National Iranian American Council (NIAC). One BoA customer told NIAC that "I realized that my checking account and credit cards were not working. I called Bank of America and was told that my accounts were frozen because I had dual citizenship." Compl. ¶ 59, *Nia v. Bank of America, N.A.*, 603 F. Supp. 3d 894 (S.D. Cal. 2022) (No. 21-cv-01799-BAS-BGS), ECF No. 1 ("*Nia* Compl.").

29. Another BoA customer complained on social media that "They [Bank of America] rejected my [online] credit card application because I am Iranian. … I didn't keep the letter but I think it said that you were born in one of the countries to which we can't give a credit card." *Nia* Compl. ¶ 60 (alterations in original).

30. On July 19, 2019, NIAC, an organization representing the interests of Iranian Americans, wrote a letter to Bank of America stating that, "Over the past several years, we have received persistent questions and

9

complaints from Iranian Americans and Iranian nationals in the U.S. whose bank accounts have been abruptly closed by Bank of America—in some cases without notice ….” The letter continued: “Our review of this material indicates Bank of America has adopted policies and practices that are clearly discriminatory towards customers of Iranian origin.” *Nia* Compl. ¶ 58.

31. As noted above, the district court in the *Nia* case held that Mr. Nia had “pled facts that plausibly suggest BANA acted on the basis of Plaintiff’s protected status, since he alleges he was denied credit despite being qualified and also alleges widespread unfair treatment of Middle Eastern individuals by BANA.” *Nia*, 603 F. Supp. 3d at 903. So too here. Like Mr. Nia, Mr. Banki was denied a BoA credit card despite being qualified (indeed, well qualified). And alarming reports of Bank of America’s unfair treatment of persons from Iran and the Middle East continue to this day.

32. On February 22, 2024, five Members of Congress—Sen. Elizabeth Warren, Sen. Bernie Sanders, Rep. Ilhan Omar, Rep. Rashida Tlaib, and Rep. Ayanna Pressley—sent a letter (“Ltr. From Congress”) to Brian Moynihan, the Chairman and Chief Executive Officer of Bank of America, to express “concern regarding reports that Bank of America may be closing customers’ bank accounts in a manner that disproportionately affects Muslim Americans and other minority communities.” Ltr. from Congress at 1 (attached as Exhibit G). The Senators and Representatives wrote that “The *New York Times*, after

10

receiving reports from hundreds of consumers, recently reported on major financial institutions shutting down accounts often without warning or recourse …." *Id.* (citing Ron Lieber, *The Way Big Banks Shut Down Customer Accounts is Callous. Let's Fix It*, N.Y. Times (Dec. 30, 2023)).

33.     The five Members of Congress wrote that "public reports suggest that financial institutions, including your own, have continued to close customers' accounts involuntarily and without basic notice, explanation, or ability to contest the decision." Ltr. from Congress at 4.  They noted that "The National Iranian American Council has documented many accounts of these practices, including an Iranian American who had an account 'frozen that was to be used for a down payment on a home, despite having sent documentation confirming their citizenship,' and students studying in U.S. universities who had their savings accounts closed without notice or lawful justification." *Id.* at 3.

34.     To describe such discriminatory banking practices, a new term has been coined:  Banking While Muslim.  *See* Ltr. from Congress at 2 n.14 (citing Youssef Chouhoud, *Banking While Muslim*, Inst. for Soc. Pol'y & Understanding (Mar. 14, 2023), https://www.ispu.org/banking-while-muslim/).

35.     Bank of America has been criticized in recent months for its questionable debanking practices and lack of transparency in its dealings with customers.  As in Mr. Banki's case, BoA has brushed off other debanked

customers with vague assertions that they did not align with the bank's "risk tolerance."

36. A March 2024 article in *National Review* reported that, "In 2023, Bank of America closed the long-standing bank account of Memphis-based Indigenous Advance Ministries, a Christian nonprofit that helps impoverished widows, orphans, and other at-risk populations in Uganda. The bank also closed the accounts of a local church that donates to the ministry. The bank told the ministries it would no longer serve their 'business type,' and that Indigenous Advance exceeded the 'bank's risk tolerance.'" Lathan Watts, *'De-Banking' Is No Joke*, Nat'l Review (Mar. 11, 2024), https://www.nationalreview.com/2024/03/de-banking-is-no-joke/amp/.

37. The *National Review* article continued: "This isn't the only time Bank of America has canceled a ministry's account under similar circumstances. At the height of the Covid-19 pandemic in 2020, a ministry named Timothy Two Project International received a nearly identical letter from the bank. Like Indigenous Advance, this ministry was repeatedly stonewalled in attempts to gain clarity about the cancellation and how to resolve it." *Id.*

38. On April 15, 2024, the Attorney General of the State of Kansas, Kris Kobach, along with 14 other Attorneys General, sent a letter ("AG Ltr.")

to BoA CEO Moynihan regarding Bank of America's objectionable debanking practices.  *See* AG Ltr. (attached as Exhibit H).

39.     The Attorneys General began by observing, quite correctly, that "It is nearly impossible to function today as an individual, family, or organization without a bank account, a credit card, and the ability to obtain a loan.  Federal and state governments recognize the necessity of these kinds of financial services, which is why they have passed numerous laws to prohibit various types of discrimination in the past."  AG Ltr. at 1.

40.     The Attorneys General then discussed Bank of America's history of discriminatory debanking and wrote that "It is no exaggeration to say that Bank of America is responsible for some of the worst-known instances of debanking."  AG Ltr. at 2.

41.     The Attorneys General called on Bank of America to provide a written report on its "account-cancellation policies and practices, particularly regarding 'risk tolerance,'" and other similar matters, within 30 days.  AG Ltr. at 6.

**FIRST CLAIM FOR RELIEF:**
**Failure to Specify Reasons for Adverse Action**
**Equal Credit Opportunity Act, 15 U.S.C. § 1691(d)**

42.     Plaintiff re-alleges and incorporates by reference paragraphs 2–23 of this Complaint as though fully set forth herein.

13

43. The Equal Credit Opportunity Act provides that "[e]ach applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor." 15 U.S.C. § 1691(d)(2).

44. When Plaintiff applied for a credit card with Defendant, *see supra,* ¶ 10, he was an "applicant" within the meaning of ECOA. The ECOA defines "applicant" to include "any person who applies to a creditor directly for an extension, renewal, or continuation of credit." 15 U.S.C. § 1691a(b).

45. Defendant, a national bank, *see supra*, ¶ 3, is a "creditor" within the meaning of 15 U.S.C. § 1691(a). The term "creditor" includes "any person who regularly extends, renews, or continues credit." *Id*. § 1691a(e).

46. The ECOA provides that "[a] statement of reasons meets the requirements of this section only if it contains the specific reasons for the adverse action taken." 15 U.S.C. § 1691(d)(3).

47. The ECOA provides that "[f]or purposes of this subsection, the term 'adverse action' means a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." 15 U.S.C. § 1691(d)(6).

48. 12 C.F.R. Part 202 is a regulation promulgated by the Board of Governors of the Federal Reserve System pursuant to the ECOA. 12 C.F.R. Part 202 is known as "Regulation B."

49. Regulation B, 12 C.F.R. § 202.9(b)(2) provides:

> The statement of reasons for adverse action required by paragraph (a)(2)(i) of this section must be specific and indicate the principal reason(s) for the adverse action. Statements that the adverse action was based on the creditor's internal standards or policies or that the applicant, joint applicant, or similar party failed to achieve a qualifying score on the creditor's credit scoring system are insufficient.

50. Defendant's decision to deny Plaintiff a credit card, *see supra*, ¶ 14, was an "adverse action" under ECOA. 15 U.S.C. § 1691(d)(6).

51. Defendant was required to provide Plaintiff with a statement of reasons when it denied Plaintiff a credit card.

52. In violation of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691(d)(2)–(3), Defendant failed to provide Plaintiff a statement of the specific reasons for the adverse action taken, i.e., Defendant's denial of Plaintiff's application for a credit card. *See supra*, ¶¶ 14–16, 17–23.

53. In violation of ECOA and its implementing regulations, including 12 C.F.R. § 202.9(b)(2), Defendant's statement of reasons for its denial of Plaintiff's credit card application was not specific and did not indicate the principal reason or reasons for the adverse action. *See supra*, ¶¶ 13–15.

54. Under the Act and its regulations, which require more than "[s]tatements that the adverse action was based on the creditor's internal standards or policies," 12 C.F.R. § 202.9(b)(2), Defendant's statement to

Plaintiff—"we've determined that we're unable to approve your request because your risk profile does not align with the bank's risk tolerance"—is legally insufficient. *See supra*, ¶¶ 13–15.

**SECOND CLAIM FOR RELIEF:**
**National Origin Discrimination**
**Equal Credit Opportunity Act, 15 U.S.C. § 1691(a)**

55. Plaintiff re-alleges and incorporates by reference paragraphs 2–41 of this Complaint as though fully set forth herein.

56. The Equal Credit Opportunity Act makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—(1) on the basis of race, color, religion, national origin, sex or marital status, or age …." 15 U.S.C. § 1691(a).

57. Defendant, a national bank, *see supra,* ¶ 3, is a "creditor" within the meaning of 15 U.S.C. § 1691(a). The term "creditor" includes "any person who regularly extends, renews, or continues credit." *Id*. § 1691a(e).

58. When Plaintiff applied for a credit card with Defendant in March 2023, *see supra,* ¶ 10, he was an "applicant" within the meaning of 15 U.S.C. § 1691(a). The term "applicant" includes "any person who applies to a creditor directly for an extension, renewal, or continuation of credit." *Id*. § 1691a(b).

59. Plaintiff's application for a Bank of America credit card, and Defendant's denial of his application, *see supra*, ¶¶ 10–13, were "credit transaction[s]" within the meaning of 15 U.S.C. § 1691(a) because "every

aspect of an applicant's dealings with a creditor regarding an application for credit" is a credit transaction, *see* 12 C.F.R. § 202.2(m).

60. Although Plaintiff was qualified for credit, Defendant denied his credit card application in March 2023. *See supra*, ¶¶ 6–9, 10–13, 31.

61. Plaintiff is a member of a protected class under 15 U.S.C. § 1691(a). Plaintiff is a person of Iranian national origin. *See supra*, ¶¶ 2, 6.

62. In violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a), Defendant discriminated against Plaintiff—or "treat[ed] [him] less favorably than other applicants," 12 C.F.R. § 202.2(n)—with respect to a credit transaction on the basis of Plaintiff's Iranian national origin. *See supra*, ¶¶ 9–18, 24–41.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A. An award of actual damages pursuant to 15 U.S.C. § 1691e(a) in an amount to be determined at trial;

B. An award of punitive damages pursuant to 15 U.S.C. § 1691e(b) in an amount to be determined at trial;

C. A judgment pursuant to 15 U.S.C. § 1691e(c) declaring that Defendant's failure to specify the reasons for its refusal to extend credit to Plaintiff was unlawful and violated the Equal Credit Opportunity Act;

D. A judgment pursuant to 15 U.S.C. § 1691e(c) declaring that Defendant's refusal to extend credit to Plaintiff was unlawful and violated the Equal Credit Opportunity Act;

E. An injunction pursuant to 15 U.S.C. § 1691e(c) requiring Defendant to provide a legally sufficient written statement of the specific reasons for its refusal to extend credit to Plaintiff;

F. An injunction pursuant to 15 U.S.C. § 1691e(c) requiring Defendant to extend the credit for which Plaintiff had applied;

G. An injunction pursuant to 15 U.S.C. § 1691e(c) prohibiting Defendant from violating Plaintiff's rights under the Equal Credit Opportunity Act in future credit transactions with him;

H. Any other appropriate equitable relief pursuant to 15 U.S.C. § 1691e(c);

I. Attorney's fees and costs pursuant to 15 U.S.C. § 1691e(d); and

J. Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci\*
Edward H. Trent (FBN 957186)
  *Lead Counsel*
Brian J. Field\*
Joshua J. Prince\*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
cbartolomucci@schaerr-jaffe.com
etrent@schaerr-jaffe.com
bfield@schaerr-jaffe.com
jprince@schaerr-jaffe.com

\*Special admission

*Counsel for Plaintiff
Mahmoud Reza Banki*

Dated: February 19, 2025

**DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff

Reza Banki demands a jury trial in this case.

/s/ H. Christopher Bartolomucci
H. Christopher Bartolomucci*
Edward H. Trent (FBN 957186)
 *Lead Counsel*
Brian J. Field*
Joshua J. Prince*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
cbartolomucci@schaerr-jaffe.com
etrent@schaerr-jaffe.com
bfield@schaerr-jaffe.com
jprince@schaerr-jaffe.com

*Special admission

*Counsel for Plaintiff*
*Mahmoud Reza Banki*

Dated: February 19, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I further certify that the foregoing is served on all counsel of record by email generated by the CM/ECF system.

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci*
